Good morning. My name is Bob Burns. I represent the Plaintiff Appellant DBSI Signature Place, LLC, which I'll refer to as DBSI. If I have any time left over, I'm going to move quickly. I hope to. I would reserve it for rebuttal. There are, of course, two claims on appeal. The first has to do with DBSI's claim to recover approximately $1.25 million in tenant improvement costs, which are referred to in the briefing and referred to in the leases as tenant unfit allowances. DBSI contends that Defendant Greensboro breached the covenant of good faith and fair dealing by preparing two tenant estoppel certificates stating that the tenants asserted no claim. And I stress the word claim. But they didn't prepare the documents. The tenants prepared them, correct? No, that's not correct. That's not correct. I thought that the tenant certificates were attached to the agreement. The form of the estoppel certificate is Exhibit H to the contract between DBSI and Greensboro. Greensboro prepared the specific tenant estoppel certificates, filled in the names of the tenants, filled in the information, supplied them to the tenants for signature. The tenants signed them, gave them back to Greensboro. One was inaccurate about the estoppel certificates. At the time they were executed, neither of the tenants had completed the conditions of the lease, which allowed them to demand from the landlord reimbursement for the T.I.s. That is correct. But the question is whether the word claim includes contingent claims or whether the word claim means everything has been satisfied and fulfilled so that you have an immediate right to payment. Is there something in the North Carolina jurisprudence which tells us that claim means contingent claims? Yes. What's that case? There's not a case other than the rule that where there is a dispute with respect to the meaning of a word such as claim that you look to Black's Law Dictionary to determine the meaning. A claim arises, the normal language, claim arises when all the conditions which entitle the claimant to make claim have occurred. That's not what Black's Law Dictionary says. Black's Law Dictionary says a claim means contingent claims, disputed claims, claims that have not yet arisen. And so the whole concept is to look at what does the word claim mean in ordinary English. And the North Carolina Supreme Court says in situations such as this, you refer to Black's Law Dictionary. If you refer to Black's Law Dictionary, it defines claims to include contingent claims. And that is the point. Clearly, if the word claim includes contingent claims, these tenant estoppel certificates, as prepared by Greensboro and submitted to DBSI, were false. They incorrectly stated the matter. And the whole issue on appeal here is what does the word claim mean. But a contingent claim is contingent on the completion of all the conditions which make it contingent. If the tenant doesn't complete the work, if the tenant doesn't get an occupancy certificate or whatever the local zoning people require, then the claim will never mature. It will never be ripe. That's correct. And you're saying that the tenants, the estoppel certificates were misleading and in bad faith because they didn't say there's a possibility of claims being made here which haven't been made already. That's what they should have said? What should have occurred is that if there was a misleading statement or a statement that was confusing, it should have been disclosed some way. In other words, providing a tenant estoppel certificate that says there was no claims, remember one of these tenants had completely constructed all of their improvements, was in possession, had been in possession for five months. But had not gotten the releases of the mechanics leaves from the contractor. Had not submitted the information to Greensboro for reimbursement. That's correct. No, because he hadn't gotten the leaves released by the contractor. I'm not positive whether he received it, but in any event, the documentation had not been submitted to Greensboro for payment. Right. So there was a contingency. There's no question about it. But the question is, is everybody knows that that payment is going to come forward and be submitted for reimbursement. When I say everybody knows, Greensboro knows it. The tenants, of course, knew it. So DBSI didn't know it. DBSI had no way of knowing it. Well, they could have talked to the tenants. DBSI did talk to the tenants in the sense that they got these tenant estoppel certificates. I don't know. They could have talked to the tenants. They could have said, each of these estoppel certificates has been forwarded to us. There are no claims. Is that true? It's due diligence, right, to go to each of the tenants. And these are big tenants and say, you've got no claim against the landlord because we're going to be your landlord, and if you've got some claims we want to know about it, take care of it before we sign on the dotted line. They didn't do that. Clearly they did not do that. And clearly they could have done that. The question has to do with whether or not they were misled into not doing so by receiving tenant estoppel certificates that indicated there were no claims. But those, again, getting back the certificates, they were drafted by each of the parties, by both the parties. In other words, it's an attachment, it's an exhibit to the contract, correct? That's correct. And so your client could have said, here's what we want. We want these things to say clearly this includes contingent claims, this includes whatever, whatever, whatever. They had the option to put that language in the estoppel certificates. And the fact that they didn't, I mean, they're in effect in pari delicto with Greensboro, aren't they? Well, the question is whether or not that information was inherently in the document. Because if the word claim includes contingent. But the word claim includes what you all intended it to include. I mean, you've got a contract here, and what was your intent? What was the intent of the parties? There was no testimony at trial that to, with respect to the parties or their lawyers ever having discussed what the meaning of Paragraph 5 of the tenant estoppel was. So we look to the meaning of the word claim as it's defined in Black's Law Dictionary. And Black's Law Dictionary says the meaning of the word claim includes contingent claims. Well, it says the lease is in full force in effect. There's no existing offset or defense to the payment of rent or other charges payable by the tenant. Otherwise to the enforcement of the lease. The tenant asserts no claim against the landlord. That's the key. With regard to any obligation of the landlord relating to the premises. How do you get around the word existing? How are they supposed to figure out that, oh, yeah, well, we're making some improvements here and we're spending this money and we expect to get some money back from the landlord after we complete the work and get all the lien releases and all that. I mean, this all just, as I read it, just relates to any beefs that the tenant may have against the landlord. And like the landlord owes me this or the landlord owes me that. It certainly doesn't bring to mind the claim that involves redecorating and all the rest of it. I mean, you just didn't do a good job when you set this thing up. And is this a common practice in office buildings? Obtaining tenant estoppels is an extremely common practice. Estoppels, yeah, I can understand that. Of course, you have the leases. You read all the leases. The leases are read, but there's no way to know from reading the leases. Even Sullivan, who was the lead man for Greensboro, admits you can't read the leases and tell whether or not the tenant estoppel or the tenant unfit allowances have been paid. Reading the leases won't answer this question. Well, did you talk to the tenants? They did not talk to the tenants. Well, they did not ask the tenants whether or not the tenant unfit allowances had been paid. If they had known they had not been paid, obviously this problem would not have occurred. But isn't that part of due diligence? Due diligence? It's almost you're on inquiry notice. I know you're occupying the premises. You know, what's going on? Let me just touch base with you and make sure everything's copacetic. And I realize that's all in the vernacular. Those aren't legal terms. But isn't that part of what your client was required to do as part of its due diligence? My client is required to do those things to try to obtain a reasonable understanding of what hidden bombs might be out there. And they look to these tenant estoppel certificates where they state that the tenant asserts no claim with respect to the premises. To satisfy that question, if something pops up in the tenant estoppel certificate that is flagged or raises an issue, then they go talk to the tenants. But the whole purpose of the tenant estoppel certificate is to raise issues. These tenant estoppel certificates raise no issues. And Greensboro in selling the property raised no question. They gave no clue. They gave no indication that these hidden bombs were out there. And therein lies the problem. The question comes down to whether or not my clients were misled or have a right to rely on a statement that says tenant asserts no claim against landlord with respect to the premises. Well, so they weren't asserting any claim. They weren't ready to get paid or reimbursed. The question comes back to, again, I believe, Your Honor, is whether or not the claim means an immediate right to payment or whether the word claim means a contingent claim that's going to surface. And that's why we look to the meaning of the definition of claim in Black's Law Dictionary or the other sources that are cited in the brief. What's your best case in North Carolina saying that claim in North Carolina law, which we must apply in a diversity case, means contingent claim as well as right claim? Well, it's not a case. It's the statute. The statute under the Uniform Fraudulent Transfer Act adopts that language that claims mean contingent claims as well. And that, of course, is cited in the brief. And it's also recited by the district court on the district court's ruling on the motion for a summary judgment. And he identified that particular statute and incorporated to indicate that there may have been claims out there at the time these tenet estables were prepared and sent out. Now, when he came down to trial and issuing his memorandum decision, he didn't address those issues. But he had addressed them and raised them. They're quoted in the opening brief. But it's the statute. It's the statute that defines claim that way. Why don't you help me out, since I don't have the brief here, and tell me what statute I should read that tells me that claim includes contingent claim? Certainly. What did your client pay for the building? I think it was $37 million. The statute is North Carolina General Statute, Section 39-23.1, Parent 3, defining claim for purposes of the Uniform Fraudulent Transfer Act as a right to payment, whether fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secure. That's a fraudulent conveyance act. I agree. Is that applicable to this case? I mean, what fraudulent conveyance are we talking about? We're not talking about a fraudulent conveyance. What we're talking about is what the meaning of the word claim is. And the meaning of the word claim is used in a variety of different instances, including that particular statute, to include contingent, unmatured claims. And so since that is the meaning that's used over and over again, including in Black's Law Dictionary and other legal dictionaries and the statutes, I submit that that is the normal and customary meaning of the word claim. All right. Well, maybe next time you just have a little asterisk, a footnote. Put that definition in there. Fortunately, Your Honor, I didn't prepare this contract and came in after the fact. Oh, that's correct. You want to reserve the rest of your time? I would like to reserve the rest of my time. Thank you. Greensboro. May it please the Court, I'm Frank Gilstrap. I represent Greensboro, the seller. Counsel is focusing on the wrong issue. According to counsel, the key issue is the counsel reads the estoppel certificate as saying, tenant has no claim against landlord. And that gets us into this very lawyerly discussion about the nature of a claim and contingent and matured claims, that type thing. It didn't say that tenant has no claim. It says tenant asserts no claim. The purpose of the estoppel certificate is not to give people information. It's to let you know what the tenant's position is. It's in paragraph five of the estoppel certificate. The one for Greensboro Orthopedic Clinic is on 134 of the record. So it's a statement of what the tenant asserts, not what the tenant has. And I think everybody in the case has tended to overlook that issue, and so we get into this discussion over whether it was a claim. I don't think it makes any difference. Doesn't the certificate also say that the tenant asserts no existing claim? Wasn't that accurate? No, it didn't. It says tenant asserts no claim. No claim. Yes. Asserts no claim. Where does the word existing come in? Is that, Judge? I think that's something the parties have disagreed on. In other words, we've taken the position, oh, no, that applies only to existing claims. It says there's no existing offset or defense. Yes, that's different. That's an offset or defense. Oh, I see. Existing only deals with offset and defense, not with claim. That's correct. That's correct. But why isn't a reimbursement for tenant improvements an offset to rent? Well, I guess that can draw us back into the same controversy. But I think we're overlooking the fact that this is a claim not for breach contract, but for breach of the implied covenant of good faith and fair dealing. We won. The court said we had not breached that covenant, and they want you to find, as a matter of law, that we did breach the covenant of good faith and fair dealing, which means either that we acted in bad faith or that we breached some overarching standard of objectionable reasonableness. They've got a case on that. Well, the question of bad faith is uniquely within the province of the fact finder, not this court. And insofar as unreasonableness is concerned, in finding of fact 33 on page 40 of the record, the court found that we had used reasonable efforts to obtain the certificate. I think they've got. Reasonableness is also a matter of fact, isn't it? It is. That's correct. That's correct. And so I think they've got an impossible burden. Now, you know. Mr. Gilstrap, it is not unknown that the Ninth Circuit indulges once in a while in appellate fact finding. Almost impossible burden, perhaps I should say. Now, you know, there is evidence to support the court's absence of a finding. We testified, our people testified, that they didn't think the certificate covered the tenant outfit allowance. Why don't your clients tell the buyer, you know, these people in these suites, they're spending a million dollars apiece or whatever it is. They're going ahead.  And we told them that when they're through and they've got all the liens waived and are satisfied, they just bring all that to us and we're going to pay them some money. So they'll probably come to you because you're going to own the building. And, of course, with the building you get those nice improvements. And the rent that we put on the building contemplates our getting back that investment and we've spread it out. So that's the situation out there. Well, the reason, I think the real reason is, is because nobody thought of it. Who owned this building? An investment group owns it and an investment group bought it. That's correct. And so there's no one around watching the cash register. Well, there is a management company and there is someone from the investment group who's in charge of the deal. I know, but a lot of these management companies are just figuring out how they can make more money for themselves. So there was no one. There wasn't an individual who was a seller or a buyer who was going to watch this. And that is why. You had one of these reeds. And that's why the parties bargained for a due diligence procedure. And they had several lawyers and several people who were in charge of doing the due diligence. Now, you know, if you're going to charge us with knowledge of the tenant outfit certificates because, you know, after all it's in the lease, it seems to me you've got to charge them too. In fact, they knew more about it than we did. There is evidence that 90% of the tenant outfit allowance involves GOC, Greensboro Orthopedic Clinic. There is evidence that their representative went to the site and saw the improvements that Greensboro Orthopedic Center was doing. There's no evidence that we did. If there's evidence that we breached the covenant, if you can conclude conclusively, if that's the word, that we breached the covenant of good faith and fair dealing, you would also have to deal with the question of causation. And how could anything we do have caused them damage when they knew more than we did? Mr. Gilstrap, let me ask you this. Taking your point regarding the finding of the trial court that you were not in bad faith and you did not breach a standard of reasonableness to be fact findings, does that matter? Well, it's... Hold that one. Okay. Suppose they are fact findings. What is our standard of review? Do we see whether the trial court committed error? Do we do a de novo review? Do we do an abuse of discretion review? Do we do a clear error review as to those fact findings? Can you address that issue? They want you. Who's they? No, no, no. I don't care about they. Okay. What do you say? Okay. Well, in response to this, you will have to review the entire record and rule conclusively that we acted in bad faith or that we breached some standard of objective reasonableness. Hold on. Let's see if I can make myself clear. I haven't done it. Let me try again. We have two types of factual review, at least in this circuit. One is de novo review where we read the record and decide what the facts were for ourself, right? We use that in habeas corpus. We have abuse of discretion or clearly erroneous review as to fact findings of inferior courts where in a district court makes a fact finding, right, bad faith. We say if there is evidence from which a district court could reasonably find there was no bad faith, even if we see it differently, if we were the trial judges, we would see it differently. We defer to the finding of fact by the trial judge. Now, which of those two applies in this case? Assuming that there is a finding that we did not act in bad faith and we did not breach the standard of objective reasonableness, assuming that, then your standard is clearly erroneous. Clearly erroneous. Thank you. But, you know, they had to get the opposite finding. That's the point I'm trying to make. It was their burden to get the opposite finding. It seems to me that is an even more difficult standard of review. We don't have to worry about that because they didn't get that finding. All right. All right. Then I'll move on. I want to touch briefly. Yes, sir. The day, what was the name of the management company? The name of the management company, I can't recall the name of the management company. I'm sorry. It was Mr. McMurray. Was he McMurray? Yes. Did he stay on? Yes. It's my understanding that he stayed on and I believe that's right. I could be wrong. He would know everything, presumably. Well, that's the problem is presumably, you see, because this was an enormous office building. It's 300,000 square feet. That's one and a half times the size of a Walmart super center. And the fact is that not everybody knew what was going on with the tenants. That's why we had due diligence. I would like to touch briefly on the other issue in the case, and that is the proration issue. So if nobody knows what's really going on. What's that? Was this REIT? I don't think it was a REIT. Well, what was it? I think it was just some investors held it. I don't know how DVSI was organized, but our people, it was just some investors that owned the building. It wasn't traded on an exchange? No, no, no, it wasn't anything like that. So did the investors know that no one really knew what was going on? You know, I don't know. I don't know whether the investors did. I'm sorry. Let me talk briefly about the proration. And here again, I think we might need to step back and scrutinize the contract once again. The issue turns on paragraph 8.4a of the sales contract. And they say that under that contract, the seller can recover only the operating expenses and taxes that were owed to us at closing. That we can only get the taxes and expenses owed to us at closing. And they say we're suing them for amounts that weren't owed. Well, there's some truth to what they're saying. Here's how it worked. We were the landlord, and our contract required the tenant to reimburse us for taxes and operating expenses. We'd estimate that at the beginning of the year. And we'd divide it by 12 and send it out to the tenant and say, this is your monthly payment. At the end of the year, we would see what we paid out, see what the tenants paid us, and usually there was a deficiency. There was in 2004, the year of sales. And so they owed us another, they owed, the tenants owed another $130,000. But they didn't owe it until after the end of the year. And they say, well, gosh, it wasn't owed until, which was after closing. It wasn't owed until after closing. Therefore, under the contract, you can't get it. Well, let's read what the contract says. It says the seller is entitled to rent and other charges collected by the purchaser, that's them, which are owed for periods prior to closing. Not owed prior to closing, which would help their argument, and that's how they read it. It's owed for periods prior to closing. That imposes the proration regime against those payments as well. And once you read that, I think it becomes a very simple case. I would say bolster this point by pointing out 8.4D. I just read 8.4A. 8.4D expressly excludes ad valorem taxes from this. If the ad valorem taxes were collected after the end of the year, we couldn't get them. Well, why did they need that provision if 8.4A does what they say it does? The answer, that would make 8.4D surplusage. And you've got a rule that you've got every part of the contract means something. That's a widely known common law rule. Once you read the contract, we win on the proration issue. Now, with that point, that's all I have. If the court has no further questions, thank you very much. Thank you. Just a couple of points. DBSI is not asking the court to engage in fact-finding. DBSI is asking the court to determine whether the meaning of the word claim includes contingent claims, which is a question of law. That was stated in the complaint as the fundamental basis for DBSI's claim against Greensboro. And the question of what a claim is is a question of law, and I would direct the court's attention to the broad decision that is referenced in the reply brief. I'd also like to clarify the record to make clear that there's no question that Greensboro's property manager, Tom McMurray, knew during the summer of 2004 that Greensboro had an obligation to reimburse both of the two tenants for their tenant improvements, knew at the time he prepared and processed the tenant estoppel certificates for these two tenants, that they both had at least contingent claims for reimbursement of their respective unfit allowances, and knew that neither reimbursement had been made as of the closing date. And I'd cite the record as ER 154 and ER 162 through 163. That is cited in our opening brief on page 19, that testimony. That's undisputed. The argument with respect to the recovery of the taxes and operating expenses comes down to this. DBSI, Greensboro, and the district court all agree that section 8.4 means that, and I quote the district court's opinion, if pass-throughs and operating expenses were owing to the seller as of the closing date and they were ultimately collected by the purchaser, DBSI, they should be paid to the seller. That's paragraph 70 of the district court's decision. At trial, Greensboro provided no evidence to establish that there was any amount owing to Greensboro, the seller, as of the closing date. DBSI went to great extent to establish that there were no such amounts owing to the seller at the closing. And I would point to Exhibit 38 in the excerpts of record, which is at page 136. All of the testimony, all of the evidence at trial, establishes that there were no amounts owing to the seller as of the closing. And the reason for that is a function of how the leases work, which is this. Until a certain threshold amount of operating expenses are incurred, there is no payment obligation by the tenants. As of the September 30th closing, that threshold level had not been met with respect to any of the tenants. In other words, no tenant had an obligation to anybody as of the September 30th closing to make any payments for any taxes or operating expenses. And your argument. Let me ask you this. What if you're in that building, and you're in there for a year, and you find out that the company that's supplying the utilities has tampered with the meters, and that the building has been charged, what, $50,000 extra every month. And that happened for the first six months while you were in the building. But it had been going on for five years before that time. Who gets to keep, assuming that you catch these utilities red-handed, and they owe upwards of millions of dollars, who gets to keep that money? When you say they owe upwards of millions of dollars, I'm a little confused. Who owes upwards of millions of dollars? The tenants? Utility company. Owes the money back to? They cheated the building. If they cheated the building, then that money would get distributed back to the tenants. Because the tenants pay the utilities. The tenants pay the utilities after you get to a threshold amount. If the building pays up to the threshold amount, then the tenants pay over that threshold amount. Okay, well, let's say that tenants paid half the utilities, and the building paid the other half. And we're over the threshold amount or not over the threshold amount? I think he's saying that we're over the threshold amount. We're over the threshold amount. If we're over the threshold amount, then all of the excess would go back to the tenants until you went under the threshold amount, and then that would be retained and be allocated. But so long as you're over the threshold amount, it all goes back to the tenants. But the excess, you've taken care of the tenants, and there's $2 million left over. Who gets that? So if it didn't go over the threshold amount, or after you repaid the tenant, you didn't go over the threshold amount, then it would go back to the building. What the utility company owes for their past misdeeds is $2 million, and all the tenants that would be entitled to it would be $1 million. So you've got another $1 million. Who gets that $1 million? Under that scenario, it would go back to the building, and then it would be subject to the proration provisions. Well, who gets the money? The landlord would get the money. What you're saying is that the landlord paid for it because it's beneath the level that the tenants paid for it. So if the landlord paid for it – I'm not talking about this lease. I'm just giving you a hypothetical, and you're making it complicated. But you're saying it would be prorated between the two landlords, in other words, between DDSI for the period it owned that building and the time that Greensboro owned the building, is that right? Under that theory, yes. Under that hypothetical, it would be yes. You'd prorate it. You'd prorate it under that theory, yes, or that hypothetical. Depending on how long the wrongdoing went on by the utility company and who owned the building during those each month. That's correct. So, for instance, it might have related to prior years, in which case it would go back to Greensboro entirely, or you'd have to take a look at the specific facts to determine when the overcharge occurred. Well, put that in your next lease, would you? None of these are my leases. What? None of these are my leases, nor my contract. Well, when you do your due diligence next time. I didn't do any of the due diligence. I'm telling you about an actual situation. All right. I'm going to take a brief recess. We'll be back here in about five minutes.
judges: Pregerson, Bea, Mahan